**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: July 13 2009

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 07-35190 |
| | ) | |
| Tina M. Wentland, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 08-3091 |
| | ) | |
| Randall M. Baker, | ) | Hon. Mary Ann Whipple |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Tina M. Wentland, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on Plaintiff Randall M. Baker's complaint to determine dischargeability of debts allegedly owed to him by Defendant Tina M. Wentland, debtor in the underlying Chapter 7 case. Plaintiff alleges that the debts should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A), (a)(4), (a)(6) and (a)(13). Defendant does not dispute that a criminal restitution debt in the amount of $95,081.81 that is owed to Plaintiff for misapplication of health insurance

premiums, a violation of 18 U.S.C. § 669(a), is nondischargeable under § 523(a)(13). However, because he contends that, as a result of such conduct, he is entitled to damages in excess of the restitution order, trial proceeded on Plaintiff's remaining claims. Given Plaintiff's position throughout the proceedings in this case that the purpose of his complaint was only to obtain a nondischargeability determination as to the debts allegedly owed him by Defendant, and for the reasons stated in the court's Memorandum of Decision and Order dated May 19, 2009 [Doc. # 35], only the liability of Defendant and the dischargeability of any debt owed by her to Plaintiff under § 523(a)(2)(A), (a)(4) and (a)(6) was addressed at trial and will be addressed by the court in this Memorandum of Decision. To the extent he prevails in this court, Plaintiff intends to liquidate his claims and seek a money judgment in state court where he has brought several state law claims that have been stayed by Defendant's Chapter 7 bankruptcy petition filing.

The district court has jurisdiction over this adversary proceeding under 28 U.S.C. §1334(b) as a civil proceeding arising in or related to a case under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio. Proceedings to determine dischargeability are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I). This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Plaintiff is entitled to judgment in his favor against Defendant on his claim brought under § 523(a)(4) and, in part, on his claim under § 523(a)(6) and that Defendant is entitled to judgment in her favor on Plaintiff's claim brought under § 523(a)(2)(A) and, in part, on his claim under § 523(a)(6).

### **FINDINGS OF FACT**

Except for a period of time from 1984 to 1986, Plaintiff was an hourly employee of an entity called Paben-Harlow ("the Company")[1] from 1969 until 2008. Since its earliest days, the Company offered a group health insurance plan to its employees, the premium for which it paid all but a small co-payment of

---

[1] The Company is referred to in the record by different names, including Paben Harlow Die Cutting and Engraving Company and Paben-Harlow Technologies, LLC. The precise name, form and ownership of the Company at various times do not have any bearing on the outcome of this adversary proceeding.

$7.00 for a single individual's coverage and $14 for family coverage, which amounts were withheld from the weekly wages of employees who chose such coverage. It is undisputed that the Company was contractually required to use the withheld funds to pay premiums for the health insurance plan. Health insurance coverage had been provided in this manner to Plaintiff for over twenty-five years during his employment at the Company.

In 1993, Defendant became President of the Company and, at all relevant times, had control of the Company's finances and was the administrator of the Company's employee health insurance plan. Although the Company had been profitable, some time before September 2004, its largest customer went out of business, after which the Company began to struggle financially. Although several employees were laid off, Defendant testified that she wanted the remaining sixteen employees to stay employed. Although she struggled to meet payroll, the Company's employees always received their pay, albeit sometimes untimely and after their earlier paycheck had been returned due to insufficient funds. At some point, however, Defendant was unable to satisfy all of the Company's obligations. According to Defendant, at that point, she let her "emotions control over [her] business sense." Defendant testified that "the bank was going to shut the company down" and so, when faced with a choice of paying the group health insurance premium or the bank, she made payments to the bank, believing it more important to keep the employees working. In addition, the Company became delinquent on certain tax obligations, which apparently resulted in its bank account being garnished by the Internal Revenue Service in an amount greater than $100,000.[2] Over approximately a two-year period, Defendant and her husband contributed $100,000 that was withdrawn from her husband's 401(k) plan to keep the business running. Due to its financial difficulties, Defendant testified that the Company had no ability to borrow money.

According to Plaintiff, as of September 1, 2004, the Company's group health insurance plan was cancelled due to non-payment of the premium. Defendant testified that she knew harm could come to the Company's employees if she did not pay the insurance premium. The record is silent as to when the premium was due and as to when Defendant was notified that the insurance had been cancelled. It is undisputed, however, that Defendant continued to withhold the employee portion of the health insurance premium from the employees' wages after cancellation and that she knowingly misapplied these funds by using them to pay other Company expenses.

---

[2] Defendant testified that the "IRS took money" from the account.

After the health insurance had been cancelled, $7 per week continued to be withheld from Plaintiff's wages. Defendant did not notify Plaintiff that his insurance had been cancelled; rather, Plaintiff learned of the cancellation from another employee in mid-November 2004. The assets of the Company were sold on November 30, 2005, to cover the debt owed by the Company to the bank and to the Internal Revenue Service. By that time, $316 had been withheld as health insurance premium co-payment amounts from Plaintiff's wages without being applied to health insurance.

Sadly, in August 2004, Plaintiff was diagnosed with prostate cancer. He underwent radiation therapy during the three month period from September through November 2004. Because his health insurance had been cancelled, he incurred significant medical expenses during this time. After learning in November of the cancellation, Plaintiff submitted his medical bills totaling approximately $90,000 to Defendant for payment, at which time, Defendant told him she "would do what she could." Defendant then caused to be paid approximately $21,748 of the medical bills before the Company was sold. The record is silent as to whether Defendant was aware of Plaintiff's diagnosis at any time before he presented his medical bills for payment. In addition to unpaid medical bills, Plaintiff testified that, although he previously had good credit, due to the unpaid medical bills and bounced payroll checks that resulted in checks written by him being bounced, his credit was damaged.

Before the unfortunate events giving rise to Plaintiff's claims in this case, the parties had a cordial relationship. Defendant testified that she has known Plaintiff her whole life. According to Plaintiff, Defendant was a person he could and did call upon for help when needed. He testified that he did not believe Defendant acted with animosity or maliciously towards him when she failed to pay the health insurance premiums.

In October 2006, Defendant pled guilty in the United States District Court for the Northern District of Ohio, Western Division, to count one of an information charging her with misapplication of health insurance premiums in violation of 18 U.S.C. § 669(a). In the plea agreement, in addition to admitting the elements of the crime, including that she "unlawfully, knowingly, willfully and intentionally" misapplied funds that were withheld from employees' salaries and wages for the purpose of paying health insurance premiums, she agreed that the Mandatory Victim Restitution Act required the court to order restitution and that the restitution include not only the total employee health insurance premiums misapplied but also the out-of-pocket medical costs individual employees incurred on or before November 30, 2005, as a result of not having medical insurance coverage due to Defendant's conduct as described in the information. [Pl. Ex.

4

1, ¶¶ 3 and 14]. She was sentenced to probation for a term of five years and restitution in the total amount of $113,429,09, which amount includes $95,081.81 to be paid to Plaintiff. [Pl. Ex. 2].

Defendant filed for relief under Chapter 7 of the Bankruptcy Code on November 30, 2007, and Plaintiff timely commenced this adversary proceeding.

## LAW AND ANALYSIS

Plaintiff seeks a determination that a debt owed to him by Defendant is nondischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(4), (a)(6) and (a) (13). As stated above, Defendant does not dispute that the criminal restitution debt owed to Plaintiff is nondischargeable under § 523(a)(13). Defendant must prove the remaining exceptions to dischargeability, including the exception for fraud, by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291(1991). Exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998).

The Company's misappropriation of funds withheld from Plaintiff's wages for payment of his share of the employee health insurance premium is the basis of Plaintiff's claims. In order to except any debt resulting from such conduct, Plaintiff must establish that Defendant can be held personally liable for such debt. An entity such as the Company in this case exists separate and apart from its officers, directors and owners. *Cf. Cash America Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 113 (B.A.P. 6th Cir. 2007). Although corporate law generally shields officers and directors from liability for the debts of the separate corporate entity, a corporate officer can be held personally liable for a tort committed while acting within the scope of her employment. *Id.* (citing *Yo-Can, Inc. v. Yogurt Exch., Inc.,* 149 Ohio App. 3d 513 (2002)). If officers "take part in the commission of the act or if they specifically directed the particular act to be done, or participated or cooperated therein," they can be held personally liable for the actions of the company. *Id.* Therefore, to the extent that Defendant engaged in tortious conduct as President of the Company, or caused the Company to commit a corporate tort, she may be held personally liable for the resulting injury.

## A. 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, [or] services,. . . to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ." In order to except a debt from discharge under this section due to false pretense or false representation, a plaintiff must prove the following elements by a preponderance of the evidence: (1) the debtor obtained money, property, services or credit through a

5

material misrepresentation, either express or implied, that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of loss. *Rembert,* 141 F.3d at 280-81.

For purposes of § 523(a)(2)(A), "false representations and false pretenses encompass statements that falsely purport to depict current or past facts." *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983). "'False pretense' involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a 'false representation' which is an express misrepresentation." *Ozburn v. Moore (In re Moore)*, 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002)(quoting *Sears Roebuck & Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 750 (Bankr. N.D. Ind. 1986)).

In addition, § 523(a)(2)(A) also addresses "actual fraud" as a concept broader than misrepresentation. *See McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000); *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873 (B.A.P. 6th Cir. 2001). "Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud." *Vitanovich*, 259 B.R. at 877 (quoting *Gerad v. Cole (In re Cole)*, 164 B.R. 951, 953 (Bankr. N.D. Ohio 1993)). A debtor's intent to defraud a creditor under § 523(a)(2)(A) is measured by a subjective standard and must be ascertained by the totality of the circumstances of the case at hand. *Id.*; *Rembert*, 141 F.3d at 281-82. A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's "course of conduct," as direct proof of intent will rarely be available. *Hamo v. Wilson (In re Hamo),* 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999). However, "[i]f there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *Buckeye Retirement Co., LLC v. Kakde (In re Kakde)* 382 B.R. 411, 427 (Bankr. S.D. Ohio 2008).

In this case, Plaintiff alleges that Defendant owes him a debt for money obtained through a material misrepresentation, false pretense and/or actual fraud. Plaintiff first argues that Defendant misrepresented that the money withheld from his wages would be used to pay, in part, his health insurance premium. There is no evidence, however, that Defendant knew such representation was false or that it was made with gross recklessness as to its truth when made to Plaintiff at the time he initially accepted the offer of health insurance through the Company's group health insurance plan. In fact, funds withheld from Plaintiff's wages were applied to his health insurance premiums for over twenty-five years before the events giving

6

rise to Plaintiff's claim. And the record is silent as to whether this representation was made to Plaintiff at any other time. Specifically, the record is silent as to whether Plaintiff received paystubs or pay advices with his paychecks during the time that the withheld funds were misappropriated that might have included a representation that funds were withheld for the purpose of paying health insurance premiums.

Nevertheless, Plaintiff also argues that Defendant failed to inform the Company's employees that she was not paying the employee health insurance premium. A failure to disclose material facts can amount to a misrepresentation where there is a duty to disclose. *See Citibank (South Dakota), N.A. v. Eashai (In re Eashai),* 87 F.3d 1082, 1089 (9th Cir.1996)*; Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re Nat'l Century Fin. Enter., Inc., Inv. Litig.)*, 604 F. Supp. 2d 1128, 1150 (S.D. Ohio 2009); *Rowe v. Steinberg (In re Steinberg)*, 270 B.R. 831, 835 (Bankr. W.D. Mich 2001). In Ohio, a "'duty to disclose arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *State v. Warner*, 55 Ohio St.3d 31, 54 (1990) (quoting *Caerula v. United States*, 445 U.S. 222, 228 (1980)). As discussed in more detail below, a fiduciary relationship did exist between Defendant and the Company's employees with respect to funds withheld from the employees' wages for payment of health insurance premiums. As such, the court finds that Defendant's failure to disclose the fact that she was not using the withheld funds to pay health insurance premiums is an omission that constitutes a material misrepresentation.

However, notwithstanding this material misrepresentation, Plaintiff has not met his burden of showing that the misrepresentation was made with an intent to deceive. The facts supporting such intent are that, at some point, Defendant knew the Company could not, and did not, pay the health insurance premium, Defendant failed to inform the employees of the Company's inability and failure to do so, the employees' portion of the premium nevertheless continued to be withheld from their wages, and those funds were then used to pay other business expenses. While certainly troubling, for the following reasons, the court finds these facts alone insufficient to conclude that Defendant acted with the requisite intent to deceive.

Although Defendant was repeatedly asked why she did not pay the health insurance premium, no explanation was sought at trial as to why Defendant did not tell the Company's employees that funds being withheld from their wages were used to pay other business expenses rather than to pay their portion of the health insurance premium. However, the court does not believe the circumstances presented to the court, viewed in the aggregate, present a picture of deceptive conduct indicating an intent to deceive. The court

7

credits Defendant's testimony that her motivation was to save the employees' jobs in the wake of the Company losing its primary customer. The company had its genesis as a family business with long-time employees like Plaintiff. Due to the Company's cash flow problems, Defendant was unable to pay the Company's portion of the insurance premium *and* pay the bank, which had the ability to "shut the company down." In her attempt to save the Company and the employees' jobs, she admittedly made poor choices. Nevertheless, the court finds significant the fact that for months after Plaintiff and, presumably, the other employees learned that the Company was not paying the health insurance premiums, the employees' portion of the premium continued to be withheld.[3] This fact negates an inference that Defendant intended to deceive the employees (*i.e.* intentionally allowing them to believe they had health insurance) by not informing them of the Company's inability to make the premium payment and continuing to withhold the employees' portion from their wages.

Moreover, while Defendant "caused" the Company to withhold the employees' portion of the premium, as Defendant admitted in her federal plea agreement, Plaintiff offered no testimony or other evidence as to how the Company's payroll was prepared (*i.e.* whether Defendant prepared the payroll herself or whether it was prepared by a third party) and no evidence of the steps that were required to be taken by Defendant to cause the improper withholdings to cease. The degree of Defendant's involvement in preparing the weekly payroll would perhaps have shed some light on Defendant's thought processes during the relevant time period and her awareness, or lack thereof, of the fact that the employee co-payments continued to be withheld. While the facts present a close case as to Defendant's intent to deceive, the court finds that Plaintiff has not shown such intent by a preponderance of the evidence.

Having found that Plaintiff has not met his burden of proving fraudulent intent, the court concludes that Defendant is entitled to judgment in her favor on this claim.

**B. 11 U.S.C. § 523(a)(4)**

Plaintiff also argues that Defendant owes him a debt that is nondischargeable under § 523(a)(4). That section excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). As Plaintiff argued that all three bases under § 523(a)(4)

---

[3] Plaintiff's portion of the health insurance premium was $7.00 per week, and a total of approximately $316 was withheld but not applied to the premium payment. Thus, the improper withholdings occurred over a period of approximately forty-five weeks (316 ÷ 7). The criminal judgment entered against Defendant states that the "Offense Ended" date was not until September 29, 2005. [Plf. Ex. 2].

8

apply, the court addresses each below.

Embezzlement and larceny are defined and determined according to federal law. *Graphic v. Grim (In re Grim)*, 293 B.R. 156, 165-66 (Bankr. N.D. Ohio 2003). For purposes of § 523(a)(4), larceny is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner." *Id.* (citing *Schreibman v. Zanetti-Gierke (In re Zanetti-Gierke),* 212 B.R. 375, 381 (Bankr. D. Kan. 1997)). Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996). Embezzlement differs from larceny in that the embezzler's initial acquisition of the property is lawful. In this case, the misappropriated funds at issue were lawfully obtained through payroll withholdings. The court therefore addresses dischargeability of a debt resulting from embezzlement rather than larceny.

A creditor proves embezzlement by establishing that (1) he entrusted his property to the debtor or debtor lawfully obtained the property, (2) the debtor appropriated the property for a use other than that for which it was intended, and (3) the circumstances indicate fraud. *Id.* at 1173. The "fraud" required under this section is "fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud." *WebMD Practice Servs, Inc. v. Sedlacek (In re Sedlacek)*, 327 B.R. 872, 881 (Bankr. E.D. Tenn. 2005). The court has already found, however, that Plaintiff did not meet his burden of proving fraud. As such, he cannot prevail on a claim of embezzlement.[4]

However, defalcation while acting in a fiduciary capacity need not rise to the level of fraud. *See Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel)*, 565 F.3d 963, 970 (6th Cir. 2009); *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 185 (5th Cir. 1997). The Sixth Circuit has defined defalcation to include a misappropriation of funds by a fiduciary, "so long as the use was not the result of mere negligence or a mistake of fact." *Patel*, 565 F.3d at 970.

"A debt is non-dischargeable as the result of defalcation when a preponderance of the evidence establishes: (1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss." *Id.* at 968. The Sixth Circuit has adopted a narrow interpretation of "fiduciary" as used in § 523(a)(4). *R.E.*

---

[4]The statute that Defendant was convicted of violating sets forth several criminal acts, including a certain type of embezzlement. 18 U.S.C. § 699(a). Defendant's guilty plea establishes that the prohibited act she was convicted of committing was intentionally misapplying funds, not knowingly and willfully embezzling, stealing or otherwise without authority converting such funds. [Plf. Ex. 1, ¶ 3].

9

*America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir. 1997). In order to trigger the defalcation provision in that statute, a debtor must hold funds in a trust for the benefit of a third party. *Id.* at 179. Furthermore, the types of trusts that will trigger the defalcation provision of § 523(a)(4) are "limited to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *Id.* at 180.

While the existence of a fiduciary relationship for purposes of § 523(a)(4) is determined by federal law, *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390 (6th Cir. 2005), the determination of whether an express or technical trust exists is governed by state law, *Chapman v. Pomainville (In re Pomainville)*, 254 B.R. 699, 702 (Bankr. S.D. Ohio 2000); *see Capitol Indemnity. Corp. v. Interstate Agency, Inc.(In re Interstate Agency, Inc.)*, 760 F.2d 121, 124 (6th Cir. 1985). Under Ohio law, "[a]n express trust is 'a fiduciary relationship with respect to property, arising as a result of a manifestation of an intention to create it and subjecting the person in whom the title is vested to equitable duties to deal with it for the benefit of others.'" *Gabel v. Richley*, 101 Ohio App.3d 356, 362-63 (1995) (quoting 5 Scott on Trusts § 462.1, at 310 (4th ed.1967)). A formal trust agreement is not necessary; rather, a trust can be shown to exist from the circumstances surrounding its creation. *Ulmer v. Fulton*, 129 Ohio St. 323, 339-40 (1935). In order to establish the existence of an express trust, a plaintiff must demonstrate (1) an intent to create a trust, (2) a trustee, (3) a trust res, and (4) a definite beneficiary. *Blaszak,* 397 F.3d at 391; *see Ulmer,* 129 Ohio St. at 339-340.

In this case, it is clear that all four requirements of a trust exist. There is no dispute that the parties agreed the Company would withhold funds from Plaintiff's wages and would apply those funds towards the premium for his health insurance. This agreement evidences the intent that the Company act as the trustee of the withheld funds, the trust res, and that the funds be applied for the benefit of Plaintiff. *See Ulmer*, 129 Ohio St. at 339 ("He to whom the property is given in trust and in whom the legal title vests is named the trustee. The one for whose benefit the trust is created is called the cestui que trust, or beneficiary. And the property given in trust is called the subject-matter, or trust res.").

A fiduciary relationship thus existed between the Company and the employees. Liability as a fiduciary, however, may also lie with a corporate officer who is responsible for handling the corporate fiduciary's trust undertakings. *See Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.)*, 760 F.2d 121 (6th Cir. 1985). In *Interstate Agency*, the Sixth Circuit addressed the nondischargeability of a debt under the Bankruptcy Act precursor to § 523(a)(4). The action was brought

10

against Arthur Lilly, the president and major stockholder of an insurance agency that had misappropriated insurance premiums paid to it on behalf of an insurance company. Finding that Michigan law establishes an insurance agency relationship as an express trust fiduciary relationship, the court found that the insurance company's loss was nondischargeable in Lilly's bankruptcy case because it constituted a defalcation by Lilly as a fiduciary. *Id.* at 124-26. Relying on Michigan law that "a corporate officer or agent is personally liable for torts committed by him even though he was acting for the benefit of the corporation," and because Lilly had "full knowledge and responsibility for the handling of Interstate's trust undertakings," the court concluded that he "was personally acting in a fiduciary capacity" and "personally responsible for the defalcation of the funds in the trust." *Id.* at 125-26.

More recently, the Sixth Circuit addressed the fiduciary capacity of Sameer Patel, an officer and major shareholder of a company that was a "contractor" under the Michigan Builders Trust Fund Act ("MBTFA"). *Patel v. Shamrock Floorcovering Servs., Inc.*, 565 F.3d 963 (6th Cir. 2009). The company had failed to pay its subcontractor with funds it had received on a construction project as required under the MBTFA. The subcontractor sought a determination that the debt owed it was nondischargeable in Patel's bankruptcy case under § 523(a)(4). The court cited an earlier decision holding that the MBTFA satisfied the "requirement that the trust exist separate from the act of wrongdoing" and that "MBTFA 'contractors' are fiduciaries to their subcontractors under § 523(a)(4)." *Id.* at 968. Relying on a Michigan Court of Appeals holding that an individual was criminally liable under the MBTFA where the individual was a corporate officer and participated in violating the MBTFA by misappropriating the beneficiary's funds, the court concluded that Patel, individually, was a fiduciary. *Id.* at 969-70 (citing *People v. Brown*, 610 N.W.2d 234, 238 (Mich. App. 2000)); *see also Nuchief Sales, Inc. v. Harper (In re Harper)*, 150 B.R. 416 (Bankr. E.D. Tenn. 1993) (finding debt nondischargeable under § 523(a)(4) in corporate officer's bankruptcy case where officer was responsible for the act constituting a defalcation of fiduciary duty).

As in *Interstate Agency* and *Patel*, in this case, Defendant was both an officer of the Company and "participated" in the defalcation by causing the Company to breach its equitable duty to apply the funds at issue in accordance with the agreement permitting it to withhold funds from Plaintiff's wages. The court, therefore, finds that the requisite fiduciary relationship has been demonstrated. More difficult, however, is a determination as to whether Plaintiff experienced a loss as a result of such breach. Plaintiff offered evidence that $316 of withholdings from his wages were misappropriated by Defendant. In addition, Plaintiff incurred medical expenses as a result of having no medical insurance in excess of $90,000.

11

Defendant, on the other hand, offered evidence that the Company paid over $21,000 of Plaintiff's medical expenses. The court notes that Plaintiff's portion of his health insurance premium was only a fraction of its total cost, the remainder being the contractual responsibility of the Company. While $316 of Plaintiff's wages, together with a portion of other employees' wages, were withheld and misappropriated by Defendant, those "trust" funds would not have been sufficient to pay the employee health insurance premium. Defendant's failure to pay the Company's portion of the premium did not constitute a breach of a fiduciary duty but a breach of the Company's contractual duty.

Nevertheless, in light of her plea agreement in district court, Defendant is collaterally estopped from arguing that Plaintiff's medical expenses and the improper withholdings from his wages were not a loss caused by her misappropriation of funds withheld from his wages for payment of the employee health insurance premium. Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979). Collateral estoppel applies where (1) the precise issue in the latter proceedings was raised in the prior proceeding, (2) the issue was actually litigated, and (3) the prior determination was necessary to the outcome. *Gonzalez v. Moffitt (In re Moffitt)*, 252 B.R. 916, 921 (B.A.P. 6th Cir. 2000). Issue preclusion may be asserted "offensively" by a litigant who was not a party to the prior federal case against a person who was a party in that case. *Allen v. McCurry,* 449 U.S. 90, 94-95 (1980).

The Mandatory Victim Restitution Act of 1996 ("MVRA") requires a federal court to order restitution to victims of certain crimes. *See* 18 U.S.C. § 3663A. In her plea agreement in her criminal case, Defendant agreed that the MVRA applied to the crime with which she was charged and that the court's restitution order include the total employee health insurance premiums misapplied as well as the out-of-pocket medical costs individual employees incurred on or before November 30, 2005, as a result of not having medical insurance coverage due to Defendant's conduct as described in the information. The judgment entered in the criminal case specifically included restitution for losses sustained by Plaintiff. Because the misapplication of health insurance premiums withheld from employees' wages was the crime to which Defendant pled guilty and is the same conduct constituting a breach of fiduciary duty as determined in this case, the court concludes that the issue of whether medical costs incurred by Plaintiff were caused as a result of the misappropriation of funds withheld from his wages was the precise issue raised and litigated in the prior criminal proceeding as it relates to the restitution ordered in that proceeding.

12

*See United States v. Hammon*, 277 Fed. Appx. 560, 568 (6th Cir. 2008) (citing *Gray v. Comm'r,* 708 F.2d 243, 246 (6th Cir.1983)) and stating that "[c]ollateral estoppel is applicable to issues litigated in criminal cases, even if by virtue of a guilty plea"). Finally, the prior determination regarding the components of the restitution order in the criminal case was necessary to the outcome in that case since the MVRA requires restitution "in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."[5] 18 U.S.C. § 3664(f)(1)(A).

Having demonstrated that Defendant owes him a debt for defalcation while acting in a fiduciary capacity, Plaintiff is entitled to a judgment declaring such debt nondischargeable under § 523(a)(4).

**C. 11 U.S.C. § 523(a)(6)**

Section 523(a)(6) provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not dischargeable. 11 U.S.C. § 523(a)(6). In order to be entitled to a judgment that the debt is excepted from discharge, Plaintiff must prove by a preponderance of the evidence that the injury from which the debt arises was both willful and malicious. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999); *J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 801-2 (Bankr. N.D. Ohio 2001). Addressing the "willful" requirement of § 523(a)(6), the Supreme Court has specifically held that "nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57. 61 (1998). Relying on the *Geiger* analysis, the Sixth Circuit concluded that "unless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' . . . he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *Markowitz*, 190 F.3d at 464 (internal citation omitted).

In addition to proving a "willful" injury, Plaintiff must also demonstrate that Defendant acted maliciously. Even absent personal malevolence, a person will be found to have acted maliciously when that person acts in conscious disregard of his or her duties or without just cause or excuse. *See Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986); *Jones*, 276 B.R. at 803.

---

[5] The court notes that this case differs from cases in which restitution is ordered for crimes that are not covered by the MVRA. In such cases, a restitution order is not essential to the court's judgment since, rather than being mandated, the district judge has discretion as to whether or not restitution should be ordered. *See, e.g., Hickman v. Comm'r*, 183 F.3d 535, 538 (6th Cir. 1999) (finding that restitution ordered in the appellant's criminal case for failing to file tax returns was not essential to the district court judgment because "the district judge enjoyed considerable discretion as to whether he should order restitution, and if so, as to the amount.").

13

In this case, Plaintiff has sustained a loss from two distinct injuries. First, he sustained an economic injury consisting of the funds withheld from Plaintiff's wages for health insurance premium payments and misappropriated by Defendant. Because this loss was substantially certain to result from Defendant's use of the funds for payment of business expenses rather than for the purpose for which they were withheld, and because Defendant's use of the funds was without just cause or excuse, the court finds that such loss was a willful and malicious injury caused by Defendant.

Plaintiff also sustained an economic injury consisting of his unpaid medical expenses as a result of Defendant failing to pay the employee health insurance premium. While Defendant's failure to pay the premium was willful, and perhaps even reckless, Plaintiff has failed to show that Defendant intended the economic injury sustained by Plaintiff or that it was "substantially certain" to follow from her decision to pay other business expenses instead. There is no evidence that Defendant was aware of the fact that Plaintiff was ill or had been diagnosed with cancer before the employee health insurance plan was cancelled. While it was certainly foreseeable that the Company's employees could incur medical expenses after the health insurance was cancelled, foreseeability does not equate with substantial certainty. *See Via Christi Reg'l Med. Ctr. v. Budig (In re Budig)*, 240 B.R. 397, 400 (D. Kan. 1999) (stating that the reasonably foreseeable standard is inconsistent with the Supreme Court's decision in *Geiger*) .

The conclusions reached in persuasively analogous cases involving an employer's failure to procure workers' compensation insurance and cases involving a driver's failure to carry liability insurance are generally in accord in holding that such failure does not per se result in a willful and malicious injury. *See, e.g., Roumeliotis v. Popa (In re Popa)*, 140 F.3d 317, 318 (1st Cir. 1998) (debtor's failure to obtain workers' compensation insurance did not fall within willful and malicious discharge exception); *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1165 (11th Cir. 1995) (stating that operating a business without workers' compensation insurance "is a clear example of recklessness" but that "the failure to insure does not guarantee that an employee will suffer a physical or economic injury"); *LaBonte v. Hall (In re Hall)*, 194 B.R. 580, 582 (W.D. Mich. 1996) (finding the plaintiff's economic injury was "'merely' a possibility in the event of a work-related physical injury" and agreeing that § 523(a)(6) requires an intentional act that *necessarily* leads to the injury); *Westfall v. Glass (In re Glass)*, 207 B.R. 850, 853 (Bankr. E.D. Mich. 1997) (debtor's knowing operation of uninsured automobile did not result in a willful and malicious injury since the automobile accident that resulted in the debt owed to plaintiff, while foreseeable, was not inevitable); *LSI Fin'l Group v. Perry (In re Perry)*, 166 B.R. 319, 321 (Bankr. M.D. Tenn. 1994) (finding that driving

14

without insurance, although in violation of applicable state law, was not "willful" under § 523(a)(6) "because it did not necessarily result in the automobile accident").

### D. Request for Attorney Fees

In his prayer for relief, Plaintiff requests an award of his attorney fees. Generally, under the "American Rule," which applies to litigation in the bankruptcy courts, a prevailing litigant may not collect attorney fees from his opponent unless authorized by federal statute or an enforceable contract between the parties. *In re Sheridan*, 105 F.3d 1164, 1166 (7th Cir. 1997). Plaintiff cites, and the court is aware of, no such authority for his request. And while an award of attorney fees may be appropriate based on state common law under certain circumstances when plaintiffs successfully prove fraud, *see Zappitelli v. Miller*, 114 Ohio St. 3d 102 (2007), Plaintiff failed to prove fraud in this case. Finally, Federal Rule of Civil Procedure 54(d), which sets forth the procedure for making a claim for attorney fees in federal court, specifically does not apply in an adversary proceeding in bankruptcy court. *See* Fed. R. Bankr. P. 7054. Instead, Rule 7008(b) of the Federal Rules of Bankruptcy Procedure sets forth the proper procedure as follows: "A request for an award of attorney's fees shall be pleaded as a claim in a complaint, cross-claim, third-party complaint, answer, or reply as may be appropriate." Thus, attorney's fees must be sought in a bankruptcy adversary proceeding by a separate count of the complaint or other pleading and not merely in the prayer for relief. *E.g.*, *Leonard v. Onyx Acceptance Corp.*, Nos. 02-8125, Civ. 03-1117 ADM, 2003 U.S. Dist. LEXIS 6307, *5, 2003 WL 1873283, *2 (D. Minn. Apr. 11, 2003); *Hartford Police F.C.U. v. DeMaio (In re DeMaio)*, 158 B.R. 890, 892-93 (Bankr. D. Conn. 1993); *Garcia v. Odom (In re Odom)*, 113 B.R. 623, 625 (Bankr. C.D. Cal. 1990); *see V.M. v. S.S. (In re S.S.)*, 271 B.R. 240, 244 (Bankr. D.N.J. 2002). Plaintiff's amended complaint does not set forth a separate claim for attorney's fees; rather, his request is included only in the prayer for relief. Plaintiff is therefore not entitled to an award of the attorney fees incurred by him in bringing this adversary proceeding.

## CONCLUSION

Finding that Plaintiff has failed to meet his burden under 11 U.S.C. § 523(a)(2)(A) and under § 523(a)(6) with respect to the debt owed him by Defendant for his unpaid medical expenses, judgment will be entered in Defendant's favor on those claims. Plaintiff has, however, sustained his burden under 11 U.S.C. § 523(a)(4) and has sustained his burden under § 523(a)(6) with respect to the debt owed him by Defendant for funds withheld from his wages but misappropriated. Judgment will, therefore, be entered in Plaintiff's favor on those claims, and the respective debts, which are not being liquidated or a money

15

judgment entered thereon in this action, will be excepted from Defendant's Chapter 7 discharge. In addition, Plaintiff is entitled to judgment in his favor on his claim brought under § 523(a)(13) and the criminal restitution debt will also be excepted from Defendant's discharge. A separate judgment in accordance with this Memorandum of Decision will be entered by the court.